REDACTED VERSION

UNITED STATES DISTRICT COURTS
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JAN 1 9 2006

MICHAEL N. MILBY, CLERK OF COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CRIMINAL NO. H-04-511 |
| | § | |
| JERRY ALFRED FUTCH, JR. | § | |

---

## DEFENDANT'S RESPONSE AND OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

---

Defendant, Jerry Alfred Futch, Jr., files his responses and objections to the United States Probation Office's Presentence Investigation Report (PSIR) as follows:

Defendant's expert report of Scott T. Jones, Ph.D., Senior Marketing Director and head of the Cambridge, Massachusetts, and Houston, Texas, offices of Lexecon Corp., demonstrates that the Office of Probation should **not** have accepted the Government expert's ("Brattle Group" or "Brattle") method or its loss calculations. After detailed examination of the data, Dr. Jones was forced to conclude,

> **"Brattle's analysis included egregious errors and strikingly inappropriate assumptions. Brattle's analysis does not meet the standards of professional economists and does not provide reliable information for [sentencing] proceedings".**

Exhibit 'A', Expert Report of Scott T. Jones, Ph.D., p.3, ¶6.

# TABLE OF CONTENTS

INTRODUCTION ............................................................................p. 7

PART ONE .................................................................................p. 9

> OBJECTION TO THE PROBATION DEPARTMENT'S ADOPTION OF GOVERNMENT LOSS CALCULATIONS AS REASONABLE ESTIMATES OF LOSS (PARAGRAPHS 16-18, 22 AND 30)

SUMMARY .....................................................................................p. 10

ARGUMENT..................................................................................p. 14

I.   BECAUSE *INSIDE FERC'S* SAMPLING METHODS DID NOT FILTER FALSE REPORTS WHICH WERE "EPIDEMIC", THE BRATTLE GROUP'S RECALCULATION OF INDICES USING *INSIDE FERC*'S DATA DOES NOT YIELD A REASONABLY ACCURATE ESTIMATE OF WHAT PRICES SHOULD HAVE BEEN, OR PERMIT A REASONABLE ESTIMATION OF LOSS ............................................................................ p.14

>   A.   Federal Energy Regulatory Commission Concluded that *Inside FERC*'s Flawed Methodology Was Undermined By an "Epidemic" of Inaccurate Reports. .......................... p. 15

>   B.   Multiple Suits and Settlements between the Commodities Futures Trading Commission and Companies Engaged In Gas Trading Demonstrate that False Reporting to the Indexes Was a Pervasive Policy within the Industry............... p. 18

>   C.   The Phenomena of Widespread Inaccurate Reporting Means Mr. Futch's Transmissions May Have Made the Indexes More Representative of the Markets........................ p. 21

II.  THE LOSSES THE GOVERNMENT SAYS MR. FUTCH CAUSED ARE GROSSLY EXAGGERATED BECAUSE THE BRATTLE GROUP FAILED TO ACCOUNT FOR COMMON STRATEGIES COMPANIES USE TO OFFSET CHANGES IN INDEX PRICES................................................... p. 22

A.  Because The Brattle Group Did Not Net Buys and Sells or Discount Hedged Positions which Minimize Potential Damages, Its Conclusions Do Not Represent Actual Losses that Mr. Futch Proximately Caused. .......................................... p. 23

    1.  An Accurate Loss Assessment Must Account for Offsetting Transactions which Minimize Potential Damages. ............................................................. p. 23

    2.  Dr. Jones' Conservative Netting Approach Drops Brattle's Loss Calculations by $265 Million Dollars. ................................................................... p.27

III.  BECAUSE INDEX PRICES CANNOT BE RECONSTRUCTED BY RECALCULATING A DIFFERENT VOLUME WEIGHTED AVERAGE, THE GOVERNMENT'S CALCULATIONS CANNOT BE REASONABLE ESTIMATES OF LOSS...................... p. 28

A.  In Nearly Twenty Percent of the Cases Examined by the Government In California Litigation, *Inside FERC*'s Published Price Was Not Equal to the Volume Weighted Average; In Mr. Futch's Case, the Government Can At Best Argue that the Index Price Was the VWA 33% of the Time ................. p. 30

B.  A Volume Weighted Average of Reported Trades Cannot Be Calculated From *Inside FERC*'s Excel Worksheets, Because Editors Changed Reported Values they Entered Into the Worksheets in Order to Make the Index Price Come Out Where They Thought It Should. ...................................... p. 32

IV.  BRATTLE GROUP'S METHODOLOGY HAS NEVER BEEN ADOPTED OR USED IN ANY CASE, AND DOES NOT MEET *DAUBERT* STANDARDS.......................................... p. 43

A.  Unlike in the Class Action Case, the Data on Gas Volumes the Government Relies Upon Comes From Sources Proven to Be Corrupt........................................................ p. 44

B.  The Class Action Experts Propose Investigation is Far More Rigorous Than Brattle's Insufficient Selection and Use of Data. ................................................................ p. 49

1.     Class Action Plaintiffs Do Not Rely Exclusively on *Inside FERC*'s Data, Since they Realize it Is Inadequate For Reconstructing an Accurate Index................. p. 49

2.     The Class Action expert realizes he must purge *Inside FERC's* data of false trades submitted by multiple companies in order to recalculate an index representative of the market............................................. p. 49

C.    The Class Action Expert Acknowledges Limitations Which Prove Fatal to Both his Attempt to Reconstruct an Accurate Index as Well as to Brattle's far Less Rigorous Efforts..... p. 50

D.    Brattle's Use of *Inside FERC* Methodology and Data Base Resulted in an Expert Report that Completely Lacks Indicia of Reliability. .................................................... p. 53

1.     Brattle Adopted a Discredited Methodology and Applied it to an Inadequate, Corrupted Data Base............. p. 55

2.     Brattle's report does not satisfy a single *Daubert* criteria. ............................................................... p. 56

E.    Brattle Group's Methods For Estimating Losses In Natural Gas Cases Fail to Hold Up In Court............................... p. 57

1.     *Nevada Power et al. vs. Enron, et al.* ................. p. 57

2.     *Matter of Jersey Central Power.* ...................... p. 59

3.     Gross Errors in Methodology Relating to Tariffs. ... p. 60

V.    ACTUAL GAIN MUST BE USED TO DETERMINE SENTENCING UNDER THE GUIDELINES .................... p. 61

A.    Analysis of the Gains to Reliant from the Alleged Misreporting is A More Accurate Basis on Which to Rest a Sentencing Decision ....................................................... p. 63

VI.  THE SENTENCE IN THIS CASE SHOULD TAKE INTO ACCOUNT THE TYPE OF CONDUCT THAT TITLE 7 U.S.C. 13(a)(2)'s BROAD LANGUAGE PERMITS THE GOVERNMENT TO PROSECUTE..................................................... p. 65

   A.   Mr. Futch, In Fact, Did Not Try To Benefit Himself or Reliant By Providing Inaccurate Reports to *Inside FERC*. ......... p. 66

   B.   Mr. Futch Cannot be Held to Have Deceived *Inside FERC* Since His Written Transmissions Clearly Notified Doolan that He Was Not Receiving Reliant's Fixed Price Physical Baseload Deals.................................................................... p. 67

PART TWO ........................................................................ p. 69

OBJECTIONS TO SPECIFIC PARAGRAPHS OF THE
PRESENTENCE INVESTIGATION REPORT

OBJECTIONS TO PARAGRAPH 7..................................... p. 69

OBJECTIONS TO PARAGRAPH 8.................................... p. 71

OBJECTIONS TO PARAGRAPH 12.................................. p. 72

OBJECTIONS TO PARAGRAPH 14.................................. p. 75

OBJECTIONS TO PARAGRAPH 15.................................. p. 76

OBJECTIONS TO PARAGRAPH 16.................................. p. 77

OBJECTIONS TO PARAGRAPH 17.................................. p. 77

OBJECTIONS TO PARAGRAPH 18.................................. p. 78

OBJECTIONS TO PARAGRAPH 19.................................. p. 79

OBJECTIONS TO PARAGRAPH 21.................................. p. 80

OBJECTIONS TO PARAGRAPHS 22 AND 31 (MORE THAN MINIMAL PLANNING)........................................... p. 80

OBJECTIONS TO PARAGRAPHS 22 AND 32 (SOPHISTICATED MEANS).......................................... p.82

OBJECTIONS TO PARAGRAPHS 24 AND 35
(OBSTRUCTION)............................................................... p. 85

OBJECTIONS TO PARAGRAPHS 35, 38 AND 67................ p. 93

OBJECTION TO TERM REFERRING TO THE OFFENSE
OF "FALSE REPORTING" AS CONTAINED IN
PARAGRAPHS 1, 14, 17, 28 AND THE PSIR FACE
SHEET COUNT ONE.................................................. p. 93

DOWNWARD DEPARTURE ................................................... p. 97

PART E FACTORS THAT MAY WARRANT DEPARTURE.
PARAGRAPHS 80 – 81

1.    The potential loss calculations overstate the seriousness of Mr.
      Futch's conduct. .................................................. p. 98

2.    Cooperation recognized where the Government refuses to make
      § 5K1.1 motion for downward departure...................... p. 99

3.    No Profit or Motive or Financial Gain to Defendant........ p. 99

4.    Selective prosecution of Mr. Futch............................. p. 101

5.    Mr. Futch's crime constituted aberrant behavior.............. p. 101

6.    Totality of the Circumstances ................................... p. 101

LIST OF EXHIBITS ............................................................ p. 103

## **INTRODUCTION**

Mr. Futch is charged with one count of violating the inaccurate reporting prong of Title 7 U.S.C. §13(a)(2), which was passed as part of the Commodities Exchange Act ("CEA"). Specifically, the Government alleges that by providing inaccurate information to a private publisher of gas index prices, *Inside FERC*, Mr. Futch caused the publication to print inaccurate estimates of gas prices that many enterprises looked to in drafting and settling contracts for the purchases and sale of natural gas. As Dr. Jones points out, the Government's expert, The Brattle Group, thinks that these features of the natural gas market permit use of a "simplistic" methodology to calculate loss. "First, Brattle calculates an amount by which Mr. Futch's actions allegedly altered each affected *Inside FERC* price index. Second, Brattle calculates a transaction amount for each such index. Finally, Brattle multiplies these two values for each case and sums the results to arrive at a total loss value." Exh. 'A', ¶24.

The errors resulting from the attempt to reduce the economic analysis of natural gas prices to a simple problem of subtraction and multiplication are legion, and lead to a loss calculation inflated 97%. Id., ¶48. Summarizing several central flaws in Brattle approach, Dr. Jones states:

a. "First, Brattle begins by assuming its conclusion, i.e., that Mr. Futch's actions caused "losses." Brattle's approach to analyzing "losses" assumes that the effect of Mr. Futch's reporting was to make the index prices published by Inside FERC less representative of true market prices. Brattle's analysis does not take account of the fact that Inside FERC's methodology relies on a sample of the market, and is therefore subject to error; and that Inside FERC may have received inaccurate survey data from other reporting market participants. Brattle's assumption that any change in the index price caused by Mr. Futch was harmful is inappropriate and Brattle's analysis fails to demonstrate that Mr. Futch caused any losses.

b. Second, even if one accepts Brattle's assumption that Mr. Futch's actions made the Inside FERC index prices less representative of the market, Brattle's errors lead to a vast overstatement of losses. For example, Brattle's errors in its use of the broker and online trading platform data lead Brattle to overstate losses by 97%."

Clearly, accepting The Brattle Group's loss analysis sponsored by the government would violate the principle that a defendant is "responsible at sentencing only to the extent that losses are caused directly by the offense conduct." *United States v. Olis*, _ F.3d _, 2005 WL 2842077 (5th Cir. 2005). Rather than following, as required by law, "a 'realistic, economic approach to determine what losses the defendant truly caused or intended to cause,'" *id.* (quoting *United States v. West Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 991 (9th Cir. 2001), The Brattle Group presents an artificial, inflated and indefensible loss calculation by ignoring several fundamental truths about the natural gas price indices and how they were used by the industry.

In Part One Mr. Futch, therefore, objects to the United States Probation

Department's conclusion that Brattle's methods and calculations result in a reasonable estimation of actual loss for purposes of the sentencing guidelines. In Part Two, he objects to specific paragraphs in the PSIR that lead, *inter alia*, to clearly erroneous enhancements for obstruction of justice, sophisticated means, and more than minimal planning. Finally, he objects to the recommendation that downward departure not be afforded, since, in this case, the Government received valuable information that warrants a downward departure as does the totality of the circumstances.

## PART ONE

### OBJECTION TO THE PROBATION DEPARTMENT'S ADOPTION OF GOVERNMENT LOSS CALCULATIONS AS REASONABLE ESTIMATES OF LOSS (PARAGRAPHS 16-18, 22 AND 30).

The Expert Report of Dr. Scott Jones attached as Exhibit "A" is herein incorporated in this objection.

For the purposes of subsection (b)(1) of U.S.S.G. § 2F1.1, "loss need not be determined with precision. However, the court must make a reasonable estimate of the loss, given the available information." United States Sentencing Commission, Guidelines Manual, § 2F1.1, comment (n. 3) (Nov. 1998). *United States v. Hammond*, 201 F.3d 346, 350 (5th Cir. 1999). Brattle's methods fall far short of reasonable estimates, especially in light the Fifth Circuit admonition that courts must follow "a 'realistic, economic approach to determine what losses the

defendant truly caused or intended to cause.'" *Id.* (quoting *United States v. West Coast Aluminum Heat Treating Co.,* 265 F.3d 986, 991 (9th Cir. 2001).

## SUMMARY

**I.** The expert report of Dr. Jones demonstrates that The Brattle Group's assumption that Mr. Futch caused harm is without foundation. Brattle discounts the fact that *Inside FERC* relied on a sample of market information and was, therefore, subject to error. Brattle assumes that false reports other than Mr. Futch's were inconsequential, while any change it calculates that Mr. Futch's reports caused made the indexes less representative of the market, and therefore were damaging. However, "Brattle's assumption that any change in index price caused by Mr. Futch was harmful is incorrect. Exh. 'A', ¶6a. In fact, "Brattle does not know whether Mr. Futch's actions had the effect of making the published index prices more or less representative of true market prices. In fact, Dr. Jones has demonstrated that **"in each of the 13 cases where Brattle finds losses, the effect of Mr. Futch's data on the volume-weighted average price is completely offset by data received from companies who paid penalties to the CFTC associated with misreporting survey data."** *Id.* ¶ 46.

**II.** Dr. Jones' analysis of the data demonstrates that even if one accepts Brattle's assumption that any change in the index it calculates Mr. Futch's reports

caused made index prices less representative, Brattle's analysis overstates losses. "Brattle's improper use of the broker and online trading platform data increases "losses" by 97%. Brattle reports losses of $272,457,247, while proper treatment of the broker and online trading platform data reduces this value to $7,198,365." *Id.* ¶48.

**III.** Relying on testimony of ████████████████████, ████████████ and sworn statements of Larry Foster, Global Editorial Director for Platt's Power Publications, Mr. Futch shows that Brattle's key assumption that index prices were volume weighted averages of reported trades calculated from data inputted into *Inside FERC*'s worksheets is mistaken. Brattle ignores testimony that *Inside FERC* editors and reporters reduced volumes traders reported, and pulled trades out of the data they were analyzing, so that the figure they calculated using the Excel program would be a price at which they believed gas was trading. In reality, the indexes were never meaningful statistical measurements. After careful review of ████████████ testimony and actual analysis of *Inside FERC*'s methods and data, Dr. Jones concluded "that Brattle's use of the volume-weighted average is inappropriate and leads to unreliable determination of losses." *Id.* ¶37.

**IV.** Probation's sole explanation for accepting Brattle's methods and results is based on a serious misrepresentation. Contrary to what the Government

told Probation, The Brattle Group's methodology has **not** been adopted by any court or expert. In particular, the aims and methods used by Plaintiff's in *In Re Natural Gas Commodity Litigation* are substantially different, and far more rigorous. Unlike The Brattle Group, Plaintiffs' expert proposes to identify false trades from many companies using <u>both</u> *Inside FERC*'s records and defendant companies' records, in order to reconstruct index prices.

Furthermore, the class action expert acknowledged that if *Inside FERC* editors arbitrarily changed data, or failed to follow McGraw-Hill's published methodology, that would undermine his efforts to recalculate accurate indexes. The testimony of ▓▓▓ shows that he and ▓▓▓▓▓▓▓▓▓▓ did exactly what the class action expert feared.

**V.** Brattle's methodology does not yield a reasonable estimate of loss. In fact, any attempt to measure the way inaccurate reports affected actual market prices of gas by reconstructing an index from *Inside FERC*'s data is bound to fail. The Government Agency, FERC, has determined that *Inside FERC's* methods for calculating gas prices would not result in prices representative of the market even if the reports the press received from traders were accurate. What FERC calls an "epidemic" of inaccurate reports transmitted by many traders at many companies made the indexes completely unreliable measurements of actual economic

transactions.

Instead of calculating loss by reconstructing an index from inadequate samples of largely inaccurate data, then multiplying volumes of gas taken from trading platforms, such as Enron Online and Dynegy Direct, which are known to have been corrupted, **Probation should use what Mr. Futch stood to gain**, or believed Reliant might gain, due to his reports. The data shows that the gains to Reliant were minimal, and that Mr. Futch's own books would not be improved at all, or else would show a benefit in the amount of a few thousand dollars. He should be sentenced accordingly.

**VI.** In considering liability, Probation should take into account the conduct that the Government is penalizing under Title 7 U.S.C. 13(a). The reports Mr. Futch gave Doolan did not contain the information that Doolan asked for; however, Mr. Futch did not try to disguise what he was submitting. Mr. Futch clearly indicated on the faxes to Mr. Doolan that the trades he was reporting were "basis trades." Mr. Futch followed company policy, surveying other Reliant traders and tabulating the results of what they reported. Mr. Futch's transmission to *Inside FERC* contained information about trades these Reliant traders reported seeing in the market. Mr. Futch did not try to manipulate the price of gas with these transmissions. The evidence shows Mr. Futch's transmissions did not

improve his books and only marginally benefited Reliant, if at all. The Government has not identified a single victim. In the end, the Government is taking advantage of a broadly worded, seldom used statute to imprison Mr. Futch for not providing exactly what Mr. Doolan, a private citizen, wanted.

## ARGUMENT

I. **BECAUSE *INSIDE FERC*'S SAMPLING METHODS DID NOT FILTER FALSE REPORTS WHICH WERE "EPIDEMIC", THE BRATTLE GROUP'S RECALCULATION OF INDICES USING *INSIDE FERC*'S DATA DOES NOT YIELD A REASONABLY ACCURATE ESTIMATE OF WHAT PRICES SHOULD HAVE BEEN, OR PERMIT A REASONABLE ESTIMATION OF LOSS.**

The Government asks Probation to accept the proposition that the index prices would have accurately reflected actual market activity if Mr. Futch had not reported inaccurate information; hence, merely subtracting Mr. Futch's trades and recalculating volume weighted averages gives reasonably accurate estimate of what the actual price of gas at specific locations and times would have been. Exh. "B", Step 2 & Step 4. However, the Government's proposal is valid only if false reporting by traders other than Mr. Futch did not have a significant affect on *Inside FERC*'s index prices. This assumption is plainly unfounded.

That the Government assumes other false trades did not substantially affect *Inside FERC*'s prices is clear. The Government acknowledges that the "recalculated" index price used for the loss analysis **"will not necessarily**

[reflect] what the 'true' or 'accurate' index price should have been, because in many instances [the index publishers'] other sources also reported false information." *Id.*, Step 2. However, without providing any justification, the Government maintains that the false information reported by other sources was not so substantial or significant that it prevents reasonably accurate reconstruction of index prices. *Id.* (stating "we believe this process will produce a reasonable estimate of what index prices would have been if a particular defendant had not reported false information."). As Dr. Jones points out *Inside FERC*'s index prices "are based on a sample of the market and are therefore subject to error." Exh. 'A' ¶ 25. Further, Brattle does not take into account that data *Inside FERC* received in its survey (apart from that of Mr. Futch) might include inaccuracies. *Id.*, ¶26. Because of these limitations, "even if Mr. Futch affected the index prices, the impact might have been to make the published index more, rather than less representative of the market." *Id.* ¶ 27.

A.      **Federal Energy Regulatory Commission Concluded that *Inside FERC*'s Flawed Methodology Was Undermined By an "Epidemic" of Inaccurate Reports.**

Other Government agencies flatly contradict the prosecution's assumption that reasonably accurate index prices can be reconstructed. As an initial matter, Federal Energy and Regulatory Commission ("FERC") staffers concluded that even if traders had reported accurately, *Inside FERC*'s method of sampling fixed

price trades only during bid week would not accurately reflect market prices:

> Another problem with reporting bid-week trades only is that the market is quite thin during this period; that is, there are fewer buyers and sellers (at least for fixed-price deals). Therefore, even if prices for trades made during bid week were reported accurately, those prices do not necessarily reflect competitive market prices. FERC, Final Report, PA02-2-000, III-31-32. Exhibit "C".

The Brattle Group makes no attempt to improve on *Inside FERC*'s methodology. In fact, Brattle Group presumes, erroneously, that it is replicating *Inside FERC* editor's work only without using Mr. Futch's trades.

Widespread inaccurate reporting exacerbated an already inadequate system for estimating actual market prices. FERC concluded that *Inside FERC* could not distinguish accurate from inaccurate reports.

> Many traders acknowledged that false reporting was done openly in the industry. Some traders believed that the periodicals that prepared the indices were able to distinguish between fictional and accurate reports, but **the Staff was unable to confirm that the periodicals could discern fictional trades and eliminate them from the index calculation.** FERC, Final Report, PA02-2-000, Executive Summary, at 6.

These reports according to *Inside FERC* were epidemic:

> Market participants provided false reports of natural gas prices and trade volumes to industry publications. These publications used the reports to compile price indices, and false reporting became epidemic. Five major traders (Williams, Dynegy, AEP, CMS, and El Paso Merchant Energy) have admitted that their employees falsified information provided to Gas Daily and

> *Inside FERC*, the most influential and relied-upon compilers of natural gas price indices. The false reporting included fabricating trades, inflating the volume of trades, omitting trades, and adjusting the price of trades. *Id.*

The assumption that other inaccurate reports have not had a substantial affect *Inside FERC*'s calculations cannot be made.

Clearly, if The Brattle Group did not eliminate the inaccurate trades reported to *Inside FERC*, its reconstructed indexes are similarly inaccurate representations of market reality. In Mr. Futch's case, the only inaccurate reports eliminated from recalculations of Volume Weighted Average ("VWA") were Reliants. Exh. "B", Step 3. The Brattle Group did not take steps to identify or screen out false reports from other traders. Since false reporting was epidemic, and *Inside FERC* editors could not distinguish between inaccurate reports and accurate ones, the VWA The Brattle Group recalculates, even with Mr. Futch's trades eliminated, is unquestionably based on substantially false and inaccurate information.

An audit of trades reported to *Inside FERC* during the period Mr. Futch reported by one of the major market participants gives an idea of how polluted The Brattle Group's unfiltered data pool is:

> CMS hired an outside counsel who analyzed the accuracy of the trades [CMS] submitted to *Inside FERC* from December 2000 to June 2002 for its monthly index. Of the 472 trades reported to *Inside FERC* for that period, there were 116 exact matches. The reasons for the 356 reported trades that did not have an exact

match were: (1) reporting the sense of the market, (2) rounding off, (3) aggregation of small deals, and (4) reporting what they saw in the market. *FERC, Final Report,* Chpt. III, p. 11.

FERC staff concluded that, a rule, although *Inside FERC* did have a spreadsheet and requested data on fixed-price deals transacted during bid week only, it is clear that the companies were reporting a combination of fixed-price deals during bid week, trades observed on EOL, and trades they made up to reach a predetermined average. *Id.*, at 29.

**B. Multiple Suits and Settlements between the Commodities Futures Trading Commission and Companies Engaged In Gas Trading Demonstrate that False Reporting to the Indexes Was a Pervasive Policy within the Industry.**

Dr. Jones' careful review of litigation brought against gas market participants shows that "nineteen gas market participants have paid fines to the CFTC as a result of settlement agreements resulting from alleged false reporting of price and volume data" to index publishers such as *Inside FERC*. Exh. "A", ¶ 28. His analysis of the composition of trades reported to *Inside FERC* at locations and times the Government alleged Mr. Futch influenced the indexes shows

"The reporting companies whose data are ███████ ████████████ relied upon by Brattle in its analysis. As shown in ████████████████████████████████ ████████████████████████████████ account for approximately ████ of the reported trades and ████ of the traded volumes ████████ ███████"

Exh. A, ¶ 28 and fig. 3b.

The methodology relied on by the Government conducted by The Brattle Group simply ignores the realities of the natural gas market place during the relevant time. The indexes depend upon accurate reporting from buyers and sellers requiring the transactions to be statistically valid. There cannot be an accurate loss assessment when the industry faced widespread unlawful manipulation of the prices of natural gas futures and option contracts from on or about January 1, 2000, to December 31, 2002, the period covering Mr. Futch's activities. Industry wide, there was deliberately reported inaccurate, misleading and false trading information that included artificial volume and price information to trade publications, including *Inside FERC*.

Moreover, energy companies engaged in a "variety of fraudulent trade reporting strategies, including wash trades, whose purposes was to create the perception of increased liquidity and demand for natural gas, and thus to manipulate the spot prices of natural gas." See *In Re: Natural Gas Commodity Litigation*, 03cv6186 (vm) (AJP) filed in the United States District Court, Southern District of New York: Amended Consolidated Class Action Complaint, page 3. The illegal trading activities lead to numerous investigations including administrative action, civil action and felony charges returned in conjunction with industry wide manipulation of natural gas prices, including false reporting. Several

energy companies paid an aggregate of approximately 298 million dollars to settle CFTC administrative actions seeking imposition of civil penalties. *Id., page 5* and *New York Times*, January 15, 2006, Sunday Business p. 7. Below is a chart of some of the cases that settled with the CFTC. An overview of these cases plus the CFTC action can be found at Exhibit "D".

| COMPANY | AMOUNT | SETTLEMENT DATE |
|---|---|---|
| Dynegy Marketing & Trade and West Coast Power, L.L.C. | $5 million | December 19, 2002 |
| E1 Paso Merchant Energy, L.P. | $20 million | March 26, 2003 |
| WD Energy Services, Inc. (formerly known as Encana Energy Services, Inc.) | $20 million | July 28, 2003 |
| The Williams Companies, Inc. and Williams Energy Marketing & Trading (currently known as Williams Power Company) | $20 million | July 29, 2003 |
| Enserco Energy, Inc. | $3 million | July 31, 2003 |
| Duke Energy Trading and Marketing, L.L.C. | $28 million | September 17, 2003 |
| Reliant Energy Services | $18 million | November 25, 2003 |
| CMS Marketing Services & Trading and CMS Field Services | $16 million | November 25, 2003 |
| Aquila Merchant Services, Inc. | $26 million | January 28, 2004 |
| Entergy-Koch Trading, L.P. | $3 million | January 28, 2004 |
| E Prime, Inc. | $16 million | January 28, 2004 |

| | | |
|---|---|---|
| Oneok Energy Marketing and Trading Company, L.P. and Oneok, Inc. | $3 million | January 28, 2004 |
| Calpine Energy Services, L.P. | $1.5 million | January 28, 2004 |
| Western Gas Resources | $7 million | July 1, 2004 |
| Coral Energy Resources | $30 million | July 29, 2004 |
| Hunter Shively | $300,000.00 | March 12, 2003 |

In addition to the confirmed manipulations, there have been numerous lawsuits and indictments alleging manipulation during the relevant period.

### C. The Phenomena of Widespread Inaccurate Reporting Means Mr. Futch's Transmissions May Have Made the Indexes More Representative of the Markets.

As Dr. Jones carefully explains, "to show losses, it is also necessary to show that Mr. Futch's actions caused the index price to be less representative of the market than it otherwise would have been." *Id.* ¶ 24. However, Mr. Futch's reports may have had a corrective function, making the indexes more accurate rather than less by balancing out other inaccurate trade information. This could happen because inaccurate reports by other traders push the VWA higher. Including Mr. Futch's reports has the effect of compensating for this distortion. Adding his data to the calculation brings the index prices within the range of representative prices. *Id.* ¶33 and Fig. 5.

## II. THE LOSSES THE GOVERNMENT SAYS MR. FUTCH CAUSED ARE GROSSLY EXAGGERATED BECAUSE THE BRATTLE GROUP FAILED TO ACCOUNT FOR COMMON STRATEGIES COMPANIES USE TO OFFSET CHANGES IN INDEX PRICES.

As an economic crime, if a loss calculation is to be used for sentencing, the Court in this case should assess the greater of the actual or intended loss. *Otis,* _ F.3d _, 2005 WL 2842077.[1] "Actual loss 'means the reasonably foreseeable pecuniary harm that resulted from the offense.'" *Id.* (quoting U.S.S.G. § 2F1.1, cmt. n 2.2(a) (200)). And while the Sentencing Guidelines discuss the causation standard, they do not "lessen the preexisting standards that held a defendant responsible at sentencing **only to the extent that losses are caused directly** by the offense conduct." *Id.* "But for" causation is usually a necessary condition for criminal liability, but is not alone sufficient. *Id.* (quoting *United States v. Marlatt,* 24 F.3d 1005, 1007 (7th Cir. 1994)). "District courts must take a 'realistic, economic approach to determine what losses the defendant truly caused or intended to cause." *Id.* (quoting *United States v. West Coast Aluminum Heat Treating Co.,* 265 F.3d 986, 991 (9th Cir. 2001) (emphasis added).

In the analogous context of securities fraud actions, the Supreme Court recently held that a plaintiff must "prove that the defendant's misrepresentation (or

---

[1] Although *Olis* is a securities fraud case, courts interpreting CEA anti-fraud provisions of the CEA look for guidance from the more developed law addressing securities violations. *See, e.g., Saxe v. E.F. Hutton & Co.,* 789 F.2d 105, 109 (2d Cir. 1986); *FDIC v. UMIC,* 136 F.3d 1375, 1384 (10th Cir. 1998).

other fraudulent conduct) **proximately caused** the plaintiff's economic loss."

*Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. _, No. 03-932, at 9 (Apr. 10,

2005) (emphasis added). The Brattle Group's loss analysis fails to establish

"actual" losses proximately caused by the offense.

A. **Because The Brattle Group Did Not Net Buys and Sells or Discount Hedged Positions which Minimize Potential Damages, Its Conclusions Do Not Represent Actual Losses that Mr. Futch Proximately Caused.**

1. **An Accurate Loss Assessment Must Account for Offsetting Transactions which Minimize Potential Damages.**

Certain categories of transactions market participants regularly enter reduce

the impact of potential changes to gas index prices. These same transactions also

reduce the potential losses or damages from changes to gas prices. The Brattle

Group has failed to account for these transactions, thus impermissibly inflating

the damage assessment sponsored by the government. Exh. "A", ¶ 40.

Initially, market participants are rarely only buyers or sellers of gas. They

often trade, both buy and sell, gas for future delivery at the exact same location

and for the same period. There are several reasons for such commercial behavior.

For example, the price of gas may change thus changing the participants' view of

whether they should be buyers or sellers. A participant's anticipated demand or

supply of gas to buy or sell may change, requiring a change to the amount bought

or sold. A participant's outlook of other market forces may change, thus changing

the participant's view of whether the offered price is higher or lower than where it will end up. Or a participant may simply be arbitraging the continuous changes in prices. There are other reasons, but the point is not the motivation for the behavior, but that the behavior is quite common. *Id.*

One result of all this trading activity is that the gross volume of gas both bought and sold will be much greater than the net volume to be bought or sold, both for the all the gas transacted at a delivery point, and for each individual market participant. For example, Company X may make ten purchases of gas with a total volume of 500,000 mmBtu/day for the month of January, and eight sales of gas with a total volume 400,000 mmBtu/day for the month of January. The net position is a purchase of only 100,000 mmBtu as compared to the 900,000 mmBtu/day gross volume of gas to be delivered in January.

A proper loss analysis will calculate the effect of price changes on only the 100,000 net mmBtu. That is because for the other 800,000 of the gross volumes, any loss from an increase in the "purchase" price necessarily results in an offsetting gain from the same volume of "sales." In civil cases for alleged damages from violation of the Commodities Exchange Act, plaintiffs that both lost and earned money as a result of price manipulation must prove a net loss, offsetting any gains against the losses. *Apex Oil Co.* v. *DiMauro,* 744 F. Supp.

53, 55-56 (S.S.N.Y. 1990). In *Apex Oil*, the court required each of the defendants, who had asserted counterclaims for damages, to net their gains and losses. After it was determined that the defendants had suffered no damages, but actually benefited from the alleged wrongdoing, the court granted summary judgment on one defendant's counterclaims because it actually profited from the alleged wrongdoing. *Apex Oil*, 744 F. Supp. at 55-56.

The Brattle Group's analysis calculates a "loss" for the full gross volumes of gas traded--all 900,000 mmBtu in the example. By failing to net buys and sells by the same, participant, the analysis improperly includes "damages" which are offset by "gains" from the changes to the index price. The gross volumes is frequently many multiples greater than the net volumes, thus improperly inflating by those same multiples the "losses" calculated by Brattle Group.

Another category of offsetting transactions are "hedge" transactions which are commonly used by natural gas market participants to decrease their exposure to changes in gas prices. Many gas transactions priced on an index are either hedged by another transaction, or are hedges themselves, such that changes to the index do not result in any actual damages. Take the following example: in September 2000, Buyer determines it needs to buy 50,000 mmBtu/day of gas for delivery in February 2001 and that $5/mmBtu would be a fair price. Supplier will agree to sell Buyer the gas, but only at the *Inside FERC* index price published in

February 2001 for gas to be delivered February 2001. Buyer enters the contract but is now exposed to the risk that the price of gas will rise above $5 before the index is published. However, Buyer can hedge (or lock in a price) by entering into a financial swap contract with Swapper. A financial swap contract calls for only an exchange of money, not actual product, although the amount of money is determined in part based on an agreed product volume. The swap contract in this example would call for Buyer to pay Swapper a fixed price ($5/mmBtu because that is the price in the example, but it could be any price) for 50,000 mmBtu/day in February 2001; and Swapper to pay Buyer the *Inside FERC* index price for the same volume of gas at during the same period (here, February 2001). Buyer has now locked in a $5 price for the 50,000 mmBtu/day of gas and is immune to any changes in the *Inside FERC* index price. That is because if the price goes above $5, Swapper pays that amount which Buyer uses to pay Producer for the gas actually delivered. If the price is below $5, Buyer pays less for the physical gas which exactly offsets the amount he pays Swapper.

Because hedges offset the risk of loss due to price changes, an accurate assessment of damages requires that hedge transactions be netted against the alleged losses. *Minpeco, S.A. v. Conticommodity Servs., Inc.,* 676 F. Supp. 486, 490 (S.D.N.Y. 1987). In *Minpeco,* defendants moved for summary judgment and argued that plaintiffs, silver futures traders asserting CEA manipulation claims,

were required to net losses in their futures trading against concomitant gains in the spot physical market. The court agreed and held that any manipulation-related losses in the futures market had to be netted against gains in the physical market. *Minpeco,* 676 F. Supp. at 490.

Hedge transactions are common, and hedging frequently is the purpose of both physical and financial trades. But to know whether a company's index transactions are hedged or not requires a particularized, detailed analysis of each company's total portfolio. Apparently Brattle Group has not performed such an analysis and the government has not collected the data required to perform such an analysis. Nonetheless, it is improper to include either physical or financial transactions hedge transactions in a calculation of actual losses. Reliance on The Brattle Group analysis is therefore improper.

### 2. Dr. Jones' Conservative Netting Approach Drops Brattle's Loss Calculations by $265 Million Dollars.

Dr. Jones' analysis for all points Brattle claims Mr. Futch reports caused losses is summarized in Exhibit 'A', Figure 9. One example is particularly remarkable. Dr. Jones points out that,

> "Brattle claims that there were 729 million mmBtu of exposure at Transco Zone 6 in January 2001, whereas a proper treatment of the data shows that open exposure was only 33 million mmBtu. In other words, Brattle overstates the relevant volumes by 96%. Because Brattle uses this grossly inflated volume in its

calculation of "losses," it calculates an enormously overstated amount of "losses." Even accepting Brattle's flawed assumptions about changes in the index prices (see below), the result of Brattle's loss calculation methodology drops from $272 million to $7 million (as shown in Figure 6zz) after taking proper account of each market participant's offsetting transactions." Exh. 'A', ¶44.

Brattle's failure to net these transactions, Dr. Jones concludes, "is an egregious error." *Id.*

Importantly, Dr. Jones points out that the $7 million loss figure "overstates the amount by which ... market participants were likely to be exposed to market risk." *Id.*, ¶ 45. Brattle only used data available for period of several months. As Dr. Jones explained, "market participants enter transactions that can have flow dates several months or even years into the future, such a brief window will of necessity miss relevant transactions." *Id.* Hence, Brattle's "improper" selection and use of data is "insufficient to calculate the parties' actual exposure to loss (or gain) from changes in index prices." *Id.*

**III. BECAUSE INDEX PRICES CANNOT BE RECONSTRUCTED BY RECALCULATING A DIFFERENT VOLUME WEIGHTED AVERAGE, THE GOVERNMENT'S CALCULATIONS CANNOT BE REASONABLE ESTIMATES OF LOSS.**

The Brattle Group's loss calculations are baseless if the Government's assumption that index prices are volume weighted averages (VWA) of the trade information received by *Inside FERC* editors during bid week is wrong. It is.

According to the Government, the *Inside FERC* editors essentially took trade information reported by companies such as Reliant, calculated a volume weighted average, and published the VWA as the index price.

> *Inside FERC*'s and NGI's published monthly index prices were usually equal to the volume weighted average price (rounded to a penny) of the trades reported to the publications for a particular location, we will estimate how any particular falsely reported trade affected an index price by eliminating that trade from the calculation of, and measuring the change in, the volume weighted average price.

Exhibit "B", at Step 2. Hence, the Government believes that measuring the effect Mr. Futch's report had on the index price of gas is a simple matter. One simply subtracts Mr. Futch's trade information, recalculates the VWA without his data, and takes the difference ("differential") between the published price and the new VWA. *Id.* To calculate loss, one only has to find the volume of gas that traded at the published index price, and multiply it by the differential. *Id.* Step 4. However, as Dr. Jones states, "Brattle does not provide any analysis or other support for its incorrect assumption that calculating the impact on the weighted average that results from removing Reliant's data from the *Inside FERC* spreadsheets is an accurate measure of the amount by which Mr. Futch's actions affected the published index." Exh. 'A', ¶35. Its method for calculating loss is therefore unreasonable.

**A.** **In Nearly Twenty Percent of the Cases Examined by the Government In California Litigation *Inside FERC*'s Published Price Was Not Equal to the Volume Weighted Average; In Mr. Futch's Case the Government Can At Best Argue that Doolan selected the VWA to be the Index Price ▓▓ of the Time.**

According to ▓▓▓▓▓▓▓▓▓▓▓ the volume weighted average calculated by the Excel spreadsheets was "▓▓▓▓▓▓▓▓▓▓▓▓" in deriving the index price ultimately published by *Inside FERC*. ▓▓▓, 2005, ▓▓▓▓, at ▓▓. Even when the frequency with which index price and VWA matched, Doolan ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

GOV'T: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓, 2004, ▓▓, at ▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓" ▓▓▓, 2005, ▓▓▓▓, at 17. These "▓▓▓▓▓▓" included,

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

The Government, nevertheless, says it ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓ of the time. ▓▓▓, 2004, ▓▓▓▓, at ▓. But that still means that nearly one

fifth of the time published price and volume weighted average were not identical. The Government therefore cannot say with any assurance that *Inside FERC*'s Chief Editor, Kelley Doolan, ████████████████████████████████ ██████████████████

Dr. Jones examined the *Inside FERC* spreadsheets used by Brattle for the seven months where Brattle claims to find "losses." Exh. 'A', ¶21. Comparing the████████████████████████revealed that



According to Dr. Jones' careful assessment, use of a recalculated volume weighted average in Mr. Futch's case "is inappropriate because Inside FERC does not use the volume-weighted average to determine the published index price." *Id.,* 36. As a result, "Brattle's methodology is inappropriate and its results are unreliable." *Id.*

The Brattle Group, furthermore, abuses its inadequate method. For example, Dr. Jones notes that the published price for October 2000 at Columbia

Appalachia is $5.55, while the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *Id*. When Mr. Brattle removed Mr. Futch's

report and recalculated the VWA, it calculated a volume weighted price of $5.55 —

identical to the price published by *Inside FERC*. *Id*. The loss therefore should be

zero. However, Brattle attributes multi-million dollars in damage, not because Mr.

Futch's trades influenced the actual published price, but because Mr. Futch

reports, when subtracted, change a calculation that the Government believes Mr.

Doolan *should have* chosen to publish as the index price.

**B.     A Volume Weighted Average of Reported Trades Cannot Be Calculated From *Inside FERC*'s Excel Worksheets, Because Editors Changed Reported Values they Entered Into the Worksheets in Order to Make the Index Price Come Out Where They Thought It Should.**

The Brattle Group's method assumes that *Inside FERC*'s editors accurately

**entered** data into the worksheets that the Brattle Group used to recalculate volume

weighted averages. If *Inside FERC* did not accurately enter the data, but changed

it on purpose in order to make the index price come out where editors thought it

should, the data in the worksheets that The Brattle Group is working with will not

yield a volume weighted average of reported trades. It will be an average of

information that *Inside FERC* has literally made up. Calculating loss using this

average clearly will not be a reasonable estimation of real economic damage,

because this average is not based on real trades or even real data.

██████████████ other *Inside FERC* editors and reporters did not enter numbers traders submitted into *Inside FERC's* Excel workbooks, and then analyze the data later. ██████████████ colleagues took editorial license and changed data before they inputted it. ████████████████████████████████████ ████████████████████████████████████████████████████████ ███████ ████████████████████████████████████████ ████████████████████████████████████████████████████ The ████████████████████████████,

██████████████████████████████████████████████ "██████████████████████████████████████████████████ you ██████████████████████████████████████████████████ ████████████ 2000. ██████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████ █████████████

Upon being pressed to explain ███████████████████████████ ██████████████████

████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████

The ███████ case is not a lone exception. ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████

[REDACTED] Using editorial judgment meant more than keeping what influence the weather could have on gas prices, [REDACTED] [REDACTED] [REDACTED] [REDACTED] [REDACTED].

[REDACTED] It is an average of values some of which *Inside FERC* editors have made up in order to make the index come out where they thought it should be. With the exception of Reliant's records, The Brattle Group has not compared the records of trades kept by companies that reported to *Inside FERC* [REDACTED] [REDACTED] The Government therefore cannot discount the substantial probability that *Inside FERC* [REDACTED] altered, if not outright invented, significant amounts of data on which The Brattle Group relied when it recalculated index prices. Once this is grasped, it becomes clear that the Government's project for calculating actual loss completely fails.

In other cases, instead of reducing volumes, [REDACTED]



In any of these cases, too, where *Inside FERC* pulled data in order to make the statistical measurements come out a certain way, volume weighted averages recalculated from information *Inside FERC* used are not valid statistical measurements of actual market activity. Even if all the trade entered in the worksheet, except Mr. Futch's, were accurately reported by the companies, **the sample is completely biased** because editors were selecting information not based on independent criteria, but based on ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Unfortunately for the Government, it appears that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ routinely used "editorial judgment" to include, eliminate, and modify data, so that statistical results would approximate what they believed the index price should be.

Mr. ▮▮▮▮▮ stated,



If *Inside FERC* had documented its decision to modify or eliminate data, The Brattle Group might have been able to reconstruct what trades were actually reported, investigate their accuracy by comparing them to company records and calculate an index based upon this data set. However, *Inside FERC* did not keep accurate records of what traders originally reported. *FERC*, Final Report, Chpt. III, pp. 29-31; July 22, 2004, ▮▮▮▮ at ▮▮▮ E-mails and faxes containing original data were discarded, lost or deleted due to human error and changes in mailbox systems. *Id.,* at 67; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ As a result, for any given trading point and time, e.g., Transco 6, December 2000, there is no way to tell how many of the entries were altered or the extent to which they were changed by *Inside FERC* editors, unless, as in the ▮▮ ▮▮▮ case, the Government obtains an accurate record from the company of the

trade information transmitted to the index publisher.

██████████████████████████████████████ process is corroborated. Larry Foster, Global Editorial Director for Platt's Power Publications, has also testified by declaration in the class action lawsuit that *Inside FERC*'s indexes were created not from a simple mathematical calculation, but with "editorial judgment", used both subjectively screen the information submitted by market participants and adjust the weighted average price calculation if the reporter felt other information indicated such an adjustment was necessary. According to Foster, the indices are a product of,

> editorial and journalistic judgment at every step, from which data points to collect and consider, to how the data points themselves or the resulting index prices should be adjusted based on editors' knowledge of overall market activity.

Third Declaration of Larry Foster, August 25, 2005 ("Foster Decl.") ¶ 7, 13-14. Exhibit "E". Indeed, Foster has testified that the indexes cannot be "corrected" because there is no method by which the editorial judgment can be replicated:

> "[I]t is simply not possible to determine retroactively what a specific price assessment would have been in the absence of particular trade data" because of editorial and journalistic judgments which "would be impossible to recreate."

Second Declaration of Larry Foster, January 7, 2005, at ¶ 5. Exhibit "F".

Foster further said:

I discussed the editorial discretion inherent in the creation of Platts' indices. This point cannot be under-estimated or discounted when considering plaintiffs' request for enforcement of its Subpoenas. Indeed, plaintiffs' Second Subpoena, seeking "all data used" in constructing Platts' indices, seems to be based on the mistaken presumption that Platts' indices are the simple product of a mathematical algorithm or statistical calculation.

... 

Transaction data that deviated significantly from other data reported for that location and time period might have either been excluded from consideration in the editorial process or been modified in a way that would reduce its impact on the index.

... 

Because of this exercise of editorial discretion, the transaction data used to calculate any given index does not necessarily match the data reported by the energy company traders, and there is no one document or set of documents that reveal, on their face, "the data used" in the creation of the indices. Moreover, because the editor responsible for arriving at the index price for any given hub for any given day or month might consider factors other than data submitted by energy companies for that hub – such as weather conditions or prices at related hubs – it is impossible to determine retroactively the data used to create the indices during the time period.

Third Declaration of Larry Foster ¶ 7, 13-14. Exhibit "E".

Brattle Group's recalculation of volume weighted averages is precisely the type of retroactive determination Foster testified is invalid. One need only examine Brattle Group's tables for evidence of the editorial judgment Foster cautioned could not be eliminated from the data or reduplicated to reconstruct what indices would have been if *Inside FERC* had utilized a different set of data. Table 2-0 of Attachment A to the Presentencing Report lists the published index

price, ███████████████████████████████████████, and Brattle Group's recalculated volume weighted average, for the Columbia Appalachia delivery location for each of the relevant months. For October 2000, the published price is $5.55, ████████████████████████████████ ███████ For March 2001, the published price is a penny lower than the ████████ price. Similar differences are seen for January 2001 for the CNG Appalachia delivery point (Table 3-0), and September 2000 and January 2001 for the Transco Zone 6 delivery point (Table 5-0).

The January 2001 Transco Zone 6 delivery point is particularly remarkable. The volume weighted average of $19.61 the Brattle Group recalculated after eliminating Mr. Futch's trades is ████████████ higher than the volume weighted average ███████████████████ five years ago using Mr. Futch's data. However, there is no ground for saying that *Inside FERC* would have published an index price of $19.61 if Mr. Futch had not reported, which is what the Government assumes would have happened. In January 2001, ███████████ published a price of $████ which is ███████████████████████████████████████████ ████████████████ In other words, even though Mr. Futch's reports pulled the volume weighted average based price down from $19.61 to $19.42, █████████████ ████████████████████████████████ This means other factors not accounted for in the calculation of the volume weighted average substantially

influenced the index price *Inside FERC* ultimately published. The Brattle Group's method does not recapture these factors. Its recalculated volume weighted average price of $19.61, therefore, cannot stand as a reasonable approximation of what *Inside FERC* editors would have published as the index price of gas on January 6, 2001 at Transco 6.

As Foster has testified, the editorial process cannot be reconstructed; hence, there is no way now to do more than speculate about what the index price might have been if the reporter had started with a calculated price of $19.61 rather than $19.42. Five years ago, *Inside FERC* editors evidently thought using the spreadsheet's volume weighted average of $19.42 would give a price *higher* than what gas was really trading at in the market. ████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████. The $19.61 price obviously did not fit with what editors concluded gas was actually being bought and sold for in January 2001 at Transco 6. The most reasonable hypothesis, then, is that $19.61 volume weighted average would have little value, and would not have been published as the index price.

Furthermore, and maybe more importantly, the fact that the Mr. Futch's